(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NESTLE USA, INC. *v.* DOE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 19–416.   Argued December 1, 2020—Decided June 17, 2021*

Respondents are six individuals from Mali who allege that they were trafficked into Ivory Coast as child slaves to produce cocoa. U. S.-based companies Nestlé USA, Inc., and Cargill, Inc., do not own or operate cocoa farms in Ivory Coast, but they do buy cocoa from farms located there and provide those farms with technical and financial resources. Respondents sued Nestlé, Cargill, and others under the Alien Tort Statute (ATS)—which provides federal courts jurisdiction to hear claims brought "by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States," 28 U. S. C. §1350— contending that this arrangement aids and abets child slavery. Because respondents' injuries occurred overseas and the only domestic conduct alleged by respondents was general corporate activity, the District Court dismissed the suit as an impermissible extraterritorial application of the ATS under *Kiobel* v. *Royal Dutch Petroleum Co.,* 569 U. S. 108. The Ninth Circuit held, as relevant, that respondents had pleaded a domestic application of the ATS, as required by *Kiobel*, because the corporations' major operational decisions originated in the United States.

*Held*: The judgment is reversed, and the case is remanded.

929 F. 3d. 623, reversed and remanded.

   JUSTICE THOMAS delivered the opinion of the Court with respect to Parts I and II, concluding that respondents here improperly seek extraterritorial application of the ATS. The Court's two-step framework for analyzing extraterritoriality issues first presumes that a statute

————————
   *Together with No. 19–453, *Cargill, Inc.* v. *Doe et al.*, also on certiorari to the same court.

applies only domestically and asks "whether the statute gives a clear, affirmative indication" that rebuts the presumption. *RJR Nabisco, Inc.* v. *European Community*, 579 U. S. 325, 337. As the Court has already held, the ATS does not rebut the presumption of domestic application. *Kiobel*, 569 U. S., at 124. In fact, the ATS does not expressly "regulate conduct" at all, much less "evince a 'clear indication of extraterritoriality.'" *Id.*, at 115–118. Second, where the statute, as here, does not apply extraterritorially, plaintiffs must establish that "the conduct relevant to the statute's focus occurred in the United States . . . even if other conduct occurred abroad." *RJR Nabisco*, 579 U. S., at 337.

The parties dispute what conduct is relevant to the "focus" of the ATS, but even if this dispute were resolved in respondents' favor, their complaint would impermissibly seek extraterritorial application of the ATS. Nearly all the conduct they allege aided and abetted forced labor—providing training, equipment, and cash to overseas farmers— occurred in Ivory Coast. Pleading general corporate activity, like "mere corporate presence," *Kiobel*, 569 U. S., at 125, does not draw a sufficient connection between the cause of action respondents seek and domestic conduct. To plead facts sufficient to support a domestic application of the ATS, plaintiffs must allege more domestic conduct than general corporate activity common to most corporations. Pp. 3–5.

THOMAS, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, in which ROBERTS, C. J., and BREYER, SOTOMAYOR, KAGAN, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined, and an opinion with respect to Part III, in which GORSUCH and KAVANAUGH, JJ., joined. GORSUCH, J., filed a concurring opinion, in which ALITO, J., joined as to Part I, and in which KAVANAUGH, J., joined as to Part II. SOTOMAYOR, J., filed an opinion concurring in part and concurring in the judgment, in which BREYER and KAGAN, JJ., joined. ALITO, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### Nos. 19–416 and 19–453

### NESTLE USA, INC., PETITIONER
19–416　　　　*v.*
### JOHN DOE I, ET AL.

### CARGILL, INC., PETITIONER
19–453　　　　*v.*
### JOHN DOE I, ET AL.

#### ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 17, 2021]

JUSTICE THOMAS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, and an opinion with respect to Part III, in which JUSTICE GORSUCH and JUSTICE KAVANAUGH join.

The Alien Tort Statute (ATS) gives federal courts jurisdiction to hear certain civil actions filed by aliens. 28 U. S. C. §1350. Although this jurisdictional statute does not create a cause of action, our precedents have stated that courts may exercise common-law authority under this statute to create private rights of action in very limited circumstances. See, *e.g.*, *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 724 (2004); *Hernández* v. *Mesa*, 589 U. S. ___, ___, ___ (2020) (slip op., at 6, 14). Respondents here seek a judicially created cause of action to recover damages from American corporations that allegedly aided and abetted slavery abroad. Although respondents' injuries occurred entirely

overseas, the Ninth Circuit held that respondents could sue in federal court because the defendant corporations allegedly made "major operational decisions" in the United States. The Ninth Circuit erred by allowing this suit to proceed.

I

According to the operative complaint, Ivory Coast—a West-African country also known as Côte d'Ivoire—is responsible for the majority of the global cocoa supply. Respondents are six individuals from Mali who allege that they were trafficked into Ivory Coast as child slaves to produce cocoa.

Petitioners Nestlé USA and Cargill are U. S.-based companies that purchase, process, and sell cocoa. They did not own or operate farms in Ivory Coast. But they did buy cocoa from farms located there. They also provided those farms with technical and financial resources—such as training, fertilizer, tools, and cash—in exchange for the exclusive right to purchase cocoa. Respondents allege that they were enslaved on some of those farms.

Respondents sued Nestlé, Cargill, and other entities, contending that this arrangement aided and abetted child slavery. Respondents argue that petitioners "knew or should have known" that the farms were exploiting enslaved children yet continued to provide those farms with resources. App. 319. They further contend that petitioners had economic leverage over the farms but failed to exercise it to eliminate child slavery. And although the resource distribution and respondents' injuries occurred outside the United States, respondents contend that they can sue in federal court because petitioners allegedly made all major operational decisions from within the United States.

The District Court dismissed this suit after we held that the ATS does not apply extraterritorially. *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108 (2013). It reasoned that

respondents sought to apply the ATS extraterritorially because the only domestic conduct alleged was general corporate activity. While this suit was on appeal, we held that courts cannot create new causes of action against foreign corporations under the ATS. *Jesner* v. *Arab Bank, PLC*, 584 U. S. \_\_\_ (2018). The Ninth Circuit then reversed the District Court in part. Although the Ninth Circuit determined that *Jesner* compelled dismissal of all foreign corporate defendants, it concluded that the opinion did not foreclose judicial creation of causes of action against domestic corporations. The Ninth Circuit also held that respondents had pleaded a domestic application of the ATS, as required by *Kiobel*, because the "financing decisions . . . originated" in the United States. *Doe* v. *Nestlé, S. A.*, 906 F. 3d 1120, 1124–1126 (2018); see also 929 F. 3d 623 (2019). We granted certiorari, 591 U. S. \_\_\_ (2020), and now reverse.

## II

Petitioners and the United States argue that respondents improperly seek extraterritorial application of the ATS. We agree.

Our precedents "reflect a two-step framework for analyzing extraterritoriality issues." *RJR Nabisco, Inc.* v. *European Community*, 579 U. S. 325, 337 (2016). First, we presume that a statute applies only domestically, and we ask "whether the statute gives a clear, affirmative indication" that rebuts this presumption. *Ibid.* For the ATS, *Kiobel* answered that question in the negative. 569 U. S., at 124. Although we have interpreted its purely jurisdictional text to implicitly enable courts to create causes of action, the ATS does not expressly "regulate conduct" at all, much less "evince a 'clear indication of extraterritoriality.'" *Id.*, at 115–118. Courts thus cannot give "extraterritorial reach" to any cause of action judicially created under the ATS. *Id.*, at 117–118. Second, where the statute, as here, does not apply extraterritorially, plaintiffs must establish that "the

conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco*, 579 U. S., at 337. "[T]hen the case involves a permissible domestic application even if other conduct occurred abroad." *Ibid.*

The parties dispute what conduct is relevant to the "focus" of the ATS. Respondents seek a judicially created cause of action to sue petitioners for aiding and abetting forced labor overseas. Arguing that aiding and abetting is not even a tort, but merely secondary liability for a tort, petitioners and the United States contend that "the conduct relevant to the [ATS's] focus" is the conduct that directly caused the injury. See *id.*, at 346 (a plaintiff who "does not overcome the presumption against extraterritoriality . . . therefore must allege and prove a *domestic* injury"). All of *that* alleged conduct occurred overseas in this suit. The United States also argues that the "focus" inquiry is beside the point; courts should not create an aiding-and-abetting cause of action under the ATS at all. See *Central Bank of Denver*, *N. A.* v. *First Interstate Bank of Denver*, *N. A.*, 511 U. S. 164, 182–183 (1994) ("[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant . . . , there is no general presumption that the plaintiff may also sue aiders and abettors" because that would create a "vast expansion of federal law"). For their part, respondents argue that aiding and abetting is a freestanding tort and that courts may create a private right of action to enforce it under the ATS. They also contend that the "focus" of the ATS is conduct that violates international law, that aiding and abetting forced labor is a violation of international law, and that domestic conduct can aid and abet an injury that occurs overseas.

Even if we resolved all these disputes in respondents' favor, their complaint would impermissibly seek extraterritorial application of the ATS. Nearly all the conduct that they say aided and abetted forced labor—providing training, fertilizer, tools, and cash to overseas farms—occurred in Ivory

Coast. The Ninth Circuit nonetheless let this suit proceed because respondents pleaded as a general matter that "every major operational decision by both companies is made in or approved in the U. S." App. 314. But allegations of general corporate activity—like decisionmaking—cannot alone establish domestic application of the ATS.

As we made clear in *Kiobel*, a plaintiff does not plead facts sufficient to support domestic application of the ATS simply by alleging "mere corporate presence" of a defendant. 569 U. S., at 125. Pleading general corporate activity is no better. Because making "operational decisions" is an activity common to most corporations, generic allegations of this sort do not draw a sufficient connection between the cause of action respondents seek—aiding and abetting forced labor overseas—and domestic conduct. "[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 266 (2010). To plead facts sufficient to support a domestic application of the ATS, plaintiffs must allege more domestic conduct than general corporate activity. The Ninth Circuit erred when it held otherwise.

## III

Respondents' suit fails for another reason, which does not require parsing allegations about where conduct occurred: We cannot create a cause of action that would let them sue petitioners. That job belongs to Congress, not the Federal Judiciary. *Sosa* indicated that courts may exercise common-law authority under the ATS to create private rights of action in very limited circumstances. 542 U. S., at 724. *Sosa* suggested, for example, that courts could recognize causes of action for three historical violations of international law: "violation of safe conducts, infringement of

the rights of ambassadors, and piracy." *Ibid.* But our precedents since *Sosa* have clarified that courts must refrain from creating a cause of action whenever there is even a single sound reason to defer to Congress. See, *e.g.*, *Hernández*, 589 U. S., at ___ (slip op., at 8). Tellingly, we have never created a cause of action under the ATS. Even without reexamining *Sosa*, our existing precedents prohibit us from creating a cause of action here.

## A

Originally passed as part of the Judiciary Act of 1789, the ATS provides jurisdiction to hear claims brought "by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. §1350. If, for example, a treaty adopted by the United States creates a tort-related duty, federal district courts have jurisdiction to hear claims by aliens for breach of that duty.

But the statute on its own does not empower aliens to sue. We have been clear that "the ATS is a jurisdictional statute creating no new causes of action." *Sosa*, 542 U. S., at 724. Aliens harmed by a violation of international law must rely on legislative and executive remedies, not judicial remedies, unless provided with an independent cause of action. In more than 200 years, Congress has established just one: the Torture Victim Protection Act of 1991. That Act creates a private right of action for victims of torture and extrajudicial killings in violation of international law. 106 Stat. 73, note following 28 U. S. C. §1350.

Because that cause of action does not apply here, respondents ask us to create a new one. They suggest that a plaintiff is entitled to a judicially created cause of action absent compelling reasons to withhold one. But our precedents demand precisely the opposite rule.

In *Sosa*, we "assume[d]" that the First Congress, which enacted the ATS, believed that federal courts, under general common law, "would recognize private causes of action

for certain torts in violation of the law of nations." 542 U. S., at 724. Although our decision in *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), "denied the existence of any federal 'general' common law," we suggested that a limited, residual amount remained to create causes of action for violations of international law. *Sosa*, 542 U. S., at 726, 729. We noted, for example, that courts in certain circumstances likely could recognize causes of action for violations of three historical torts: "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.*, at 724.

At the same time, we stressed that this authority was narrow. We noted that there was "no basis to suspect Congress had any examples in mind beyond those [three] torts." *Ibid.* And we suggested that future "development" of law might "preclud[e] federal courts from recognizing" new causes of action. *Id.*, at 724–725.

To guide our reasoning in the future, we described a two-step test that plaintiffs must satisfy before a court can create a cause of action under the ATS. First, the plaintiff must establish that the defendant violated "'a norm that is specific, universal, and obligatory'" under international law. *Id.*, at 732. That norm must be "defined with a specificity comparable to" the three international torts known in 1789. *Id.*, at 725. Second, the plaintiff must show that courts should exercise "judicial discretion" to create a cause of action rather than defer to Congress. *Id.*, at 726, 736, and n. 27; *Jesner*, 584 U. S., at \_\_\_–\_\_\_ (plurality opinion) (slip op., at 11–12).

Judicial authority under that test was narrow at the outset. Our more recent precedents have made it narrower still by stressing that judicial creation of a cause of action is an extraordinary act that places great stress on the separation of powers. Although this Court in the mid-20th century often assumed authority to create causes of action, *Ziglar* v. *Abbasi*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 8),

"[i]n later years, we came to appreciate more fully the tension between this practice and the Constitution's separation of legislative and judicial power," *Hernández*, 589 U. S., at ___ (slip op., at 5). Because *Erie* denied the existence of a federal general common law, "a federal court's authority to recognize a damages remedy must rest at bottom on a statute enacted by Congress." *Hernández*, 589 U. S., at ___–___ (slip op., at 5–6). It follows that any judicially created cause of action risks "upset[ting] the careful balance of interests struck by the lawmakers." *Ibid.*

To limit this stress on the separation of powers, our precedents have made clear that the second step of *Sosa*—which applies in any context where a plaintiff asks a court to create a cause of action—is extraordinarily strict. A court "'must'" not create a private right of action if it can identify even one "'sound reaso[n] to think Congress might doubt the efficacy or necessity of [the new] remedy.'" *Jesner*, 584 U. S., at ___ (majority opinion) (slip op., at 18) (quoting *Abbasi*, 582 U. S., at ___ (slip op., at 13)); see also *Hernández*, 589 U. S., at ___ (slip op., at 8) (same). This test is demanding by design, and we have yet to find it satisfied. See *Jesner*, 584 U. S., at ___ (slip op., at 27) (no judicially created causes of action against foreign corporations); see also *Sosa*, 542 U. S., at 725 (no judicially created cause of action for illegal detention even under the less-demanding standard initially created by *Sosa*).

B

Regardless of whether respondents have satisfied the first step of the *Sosa* test, it is clear that they have not satisfied the second. Our decisions since *Sosa*, as well as congressional activity, compel the conclusion that federal courts should not recognize private rights of action for violations of international law beyond the three historical torts identified in *Sosa*.

We recently identified a sound reason to think Congress

might doubt a judicial decision to create a cause of action that would enforce torts beyond those three: Creating a cause of action under the ATS "inherent[ly]" raises "foreign-policy concerns." *Jesner*, 584 U. S., at \_\_\_ (majority opinion) (slip op., at 19). This suit illustrates the point, for the allegations here implicate a partnership (the Harkin-Engel Protocol and subsequent agreements) between the Department of Labor, petitioners, and the Government of Ivory Coast. Under that partnership, petitioners provide material resources and training to cocoa farmers in Ivory Coast—the same kinds of activity that respondents contend make petitioners liable for violations of international law. Companies or individuals may be less likely to engage in intergovernmental efforts if they fear those activities will subject them to private suits.

Although specific foreign-policy concerns may vary from case to case, our precedents are clear that creating a cause of action to enforce international law beyond three historical torts invariably gives rise to foreign-policy concerns. *Ibid.* ("foreign-policy . . . concerns [are] inherent in ATS litigation"). Because "[t]he political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns," there will always be a sound reason for courts not to create a cause of action for violations of international law—other than perhaps for those three torts that were well established in 1789. *Id.*, at \_\_\_– \_\_\_ (slip op., at 18–19).

Congressional activity independently provides a sound reason to conclude that Congress might doubt a judicially created cause of action. It is instructive to consider the changes Congress made to the remedies in the Trafficking Victims Protection Reauthorization Act of 2003 (TVPRA), which imposes liability for offenses related to human trafficking. The initial text, passed in 2000, imposed criminal liability for human trafficking. §112, 114 Stat. 1464. Congress later added a private right of action in 2003, allowing

plaintiffs to sue the immediate "perpetrator" of a human trafficking violation. §4(a)(4)(A), 117 Stat. 2878. And then in 2008, Congress created the present private right of action, allowing plaintiffs to sue defendants who are involved indirectly with slavery. §§221, 222(b)(3), 122 Stat. 5067–5068.

This Act highlights that there are many different ways to create a cause of action that would enforce developments in international law beyond the three historical torts identified in *Sosa*—too many for courts to choose from when using the limited judicial discretion that *Sosa* recognizes. Congress may well decide to create a cause of action against one category of defendants but not another. See *Jesner*, 584 U. S., at ___ (plurality opinion) (slip op., at 20) (recognizing that Congress "unambiguously" limited the only legislative cause of action passed under the ATS to one category of defendants). Or it might make distinctions—as it did in the TVPRA—between direct and indirect liability. Congress settled on the current approach to private remedies against human trafficking only after its "understanding of the problem evolved" through years of studying "how to best craft a response." Brief for Members of Congress as *Amici Curiae* 9, 13. The judicial role is to resolve cases and controversies, which typically present only the perspectives of the parties. The Judiciary does not have the "institutional capacity" to consider all factors relevant to creating a cause of action that will "inherent[ly]" affect foreign policy. *Jesner*, 584 U. S., at ___ (majority opinion) (slip op., at 19). Respondents attempt to brush aside these concerns by suggesting that their allegations about decades-old conduct could satisfy the TVPRA if Congress had enacted that law earlier. This observation simply proves the point. Congress chose not to write a retroactive statute. To create a cause of action here would impermissibly second-guess Congress' decision not to subject past conduct to a new standard.

When we decided *Sosa*, we remarked that there is "no basis to suspect Congress had any examples in mind beyond th[ree] torts" when it enacted the ATS. 542 U. S., at 724. We "assume[d]" that no "development" of law had yet "precluded federal courts from recognizing" causes of action not created by Congress. *Id.*, at 724–725. Nobody here has expressly asked us to revisit *Sosa*. But precedents since *Sosa* have substantially narrowed the circumstances in which "judicial discretion" under the *Sosa* test is permitted. *Id.*, at 726, 736, and n. 27. Under existing precedent, then, courts in some circumstances might still apply *Sosa* to recognize causes of action for the three historical torts likely on the mind of the First Congress. But as to other torts, our precedents already make clear that there always is a sound reason to defer to Congress, so courts may not create a cause of action for those torts. Whether and to what extent defendants should be liable under the ATS for torts beyond the three historical torts identified in *Sosa* lies within the province of the Legislative Branch.

\*  \*  \*

The judgment of the Court of Appeals is reversed, and the cases are remanded for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 19–416 and 19–453

_____

### NESTLE USA, INC., PETITIONER
19–416          _v._
### JOHN DOE I, ET AL.


### CARGILL, INC., PETITIONER
19–453          _v._
### JOHN DOE I, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 17, 2021]

JUSTICE GORSUCH, with whom JUSTICE ALITO joins as to
Part I, and with whom JUSTICE KAVANAUGH joins as to Part
II, concurring.

I write separately to add two points. First, this Court
granted certiorari to consider the petitioners' argument
that the Alien Tort Statute (ATS) exempts corporations
from suit. Rather than resolve that question, however, the
Court rests its decision on other grounds. That is a good
thing: The notion that corporations are immune from suit
under the ATS cannot be reconciled with the statutory text
and original understanding. Second, the time has come to
jettison the misguided notion that courts have discretion to
create new causes of action under the ATS—for the reasons
JUSTICE THOMAS offers and others as well.

## I

The First Congress enacted what we today call the ATS
as part of the Judiciary Act of 1789. At the time, the ATS
occupied only a paragraph in the larger statute, providing
federal courts jurisdiction "concurrent with the courts of the

several States" over "all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States." §9, 1 Stat. 77. The law has hardly changed since and it remains similarly succinct: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. §1350.

Nothing in the ATS supplies corporations with special protections against suit. The statute specifies which plaintiffs may sue ("alien[s]"). It speaks of the sort of claims those plaintiffs can bring ("tort[s]" in "violation of the law of nations or a treaty of the United States"). But nowhere does it suggest that anything depends on whether the defendant happens to be a person or a corporation.

Understandably too. Causes of action in tort normally focus on wrongs and injuries, not who is responsible for them. When the First Congress passed the ATS, a "tort" meant simply an "injury or wrong" whoever committed it. G. Jacob, O. Ruffhead, & J. Morgan, A Law Dictionary (10th ed. 1773). Nothing has changed in the intervening centuries. See, *e.g.*, Black's Law Dictionary 1717 (10th ed. 2014) (a tort is a "civil wrong . . . for which a remedy may be obtained"). Generally, too, the law places corporations and individuals on equal footing when it comes to assigning rights and duties. Even before the ATS's adoption, Blackstone explained that, "[a]fter a corporation is so formed and named, it acquires many powers, rights, capacities, and incapacities," including "[t]o sue or be sued, implead or be impleaded, grant or receive, by its corporate name, and do all other acts as natural persons may." 1 W. Blackstone, Commentaries on the Laws of England 463 (1765).

If more evidence were necessary to prove the point, plenty would seem available. Case after case makes plain that, "[a]t a very early period, it was decided in Great Britain, as well as in the United States, that actions might be main-

tained against corporations for torts . . . of nearly every variety.” *Philadelphia, W., & B. R. Co.* v. *Quigley*, 21 How. 202, 210 (1859); see also, *e.g.*, *Chestnut Hill & Spring House Turnpike Co.* v. *Rutter*, 4 Serg. & Rawle 6, 17 (Pa. 1818) (“[F]rom the earliest times to the present, corporations have been held liable for torts”). Justice Story deemed the point “unquestionable.” *United States* v. *Amedy*, 11 Wheat. 392, 412 (1826). And by the late 19th century, the proposition that tort actions could be brought against corporations was “so well settled as not to require the citation of any authorities.” *Baltimore & Potomac R. Co.* v. *Fifth Baptist Church*, 108 U. S. 317, 330 (1883).

More evidence yet lies in the circumstances surrounding the ATS’s adoption. It seems Congress enacted the statute as part of a comprehensive effort to ensure judicial recourse for tortious conduct that otherwise could have provided foreign nations “with just cause for reprisals or war.” Bellia & Clark, The Alien Tort Statute and the Law of Nations, 78 U. Chi. L. Rev. 445, 476–477 (2011); see *Jesner* v. *Arab Bank, PLC*, 584 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (GORSUCH, J., concurring in part and concurring in judgment). In particular, Congress may have had an eye on three specific problems: violations of safe conduct, interference with ambassadors, and piracy. On the view of many, Blackstone included, these three offenses entailed not just injuries to the affected individuals but to their nation-states. 4 Commentaries on the Laws of England 68 (1769). So, if Americans engaged in them, and if American courts provided foreigners no recourse of any kind, European powers would have had just cause to bully the new Nation. *Id.*, at 68–69.

In that context, distinguishing between individuals and corporations would seem to make little sense. If early Americans assaulted or abducted the French Ambassador, what difference would it have made if the culprits acted individually or corporately? Either way, this Nation’s failure

to "oblige the guilty to repair the damage" would have provided just cause for reprisals or worse. 1 E. de Vattel, The Law of Nations, bk. II, §76, p. 145 (1760). Founding-era cases involving piracy seem to confirm the point too. Injured plaintiffs routinely brought *in rem* proceedings against ships involved in piracy regardless of the owner's personal involvement or liability. See, *e.g.*, *Harmony* v. *United States*, 2 How. 210, 233–234 (1844). In fact, one of the earliest ATS cases involved an action against a vessel. See *Jansen* v. *The Vrow Christina Magdalena*, 13 F. Cas. 356, 358–359 (No. 7,216) (SC 1794). All of which underscores the ATS has never distinguished between defendants.

## II

The real problem with this lawsuit and others like it thus isn't whether the defendant happens to be a corporation. To my mind, it's this: Just as the ATS nowhere privileges corporations, it nowhere deputizes the Judiciary to create new causes of action. Rather, the statute confers "jurisdiction" on federal courts to adjudicate "tort" claims by aliens for violations "of the law of nations." Perhaps this language was originally understood to furnish federal courts with authority to entertain a limited number of specific and existing intentional tort claims that, if left unremedied, could give rise to reprisals or war. See *Jesner*, 584 U. S., at ___–___ (opinion of GORSUCH, J.); Bellia, 78 U. Chi. L. Rev., at 515–521. Perhaps, too, the law affords federal courts jurisdiction to hear any other tort claims Congress chooses to create. But nothing in the statute's terse terms obviously authorizes federal courts to invent new causes of action on their own.

Nor would I find such an extraordinary authority lingering latent after all this time. This Court has never—not once in 230 years—invoked the ATS to create a new cause

of action. Of course, courts at common law may have en-
joyed the power to create (or "recognize") causes of action.
But the power to create a cause of action is in every mean-
ingful sense the power to enact a new law that assigns new
rights and new legally enforceable duties. And our Consti-
tution generally assigns *that* power to Congress. A self-gov-
erning people depends on elected representatives—not
judges—to make its laws. So what may have been a
"'proper function for common-law courts'" in England is no
longer generally appropriate "'for federal tribunals'" in this
country. *Alexander* v. *Sandoval*, 532 U. S. 275, 287 (2001).
And it's not as if we have ever, in over two centuries, faced
congressional rebuke for being asleep at the ATS switch.
Just the opposite: The one time Congress deemed a new
ATS action worth having, it created that action *itself* in the
Torture Victim Protection Act of 1991. See 106 Stat. 73.

To be sure, the Court recently complicated this picture in
*Sosa* v. *Alvarez-Machain*, 542 U. S. 692 (2004). There, the
Court recognized that federal judges usually may not in-
voke the ATS to create new causes of action. The Court also
refused to create the new cause of action the plaintiff pro-
posed. *Id.*, at 725. But *Sosa* also proceeded to speculate
that—in some future case—this Court might invoke the
ATS to create a new cause of action. "The door," *Sosa* said,
is "ajar subject to vigilant doorkeeping." *Id.*, at 729.

To what end? We have witnessed nearly two decades of
ATS litigation since *Sosa*. During that period, plaintiffs
have presented for this Court's consideration one new po-
tential cause of action after another. Each time, the law-
yering has been thoughtful and able. Always, too, the pro-
posed cause of action is potentially worthy. Yet, in every
case, we have turned up our noses. I would stop feigning
some deficiency in these offerings. However vigilant the
doorkeeper, the truth is this is a door *Sosa* should not have
cracked. Whether and which international norms ought to
be carried into domestic law—and how best to accomplish

that goal while advancing this country's foreign policy in-
terests—poses "delicate" and "complex" questions involving
"large elements of prophecy . . . for which the Judiciary has
neither aptitude, facilities nor responsibility." *Chicago &
Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S.
103, 111 (1948) (Jackson, J., for the Court). Were we to cre-
ate new causes of action, we would risk doing exactly what
Congress adopted the ATS to avoid: complicating or even
rupturing this Nation's foreign relationships. When it
comes to responsibility in this area, the Constitution could
not be clearer. It invests Congress with the power to "define
and punish . . . Offences against the Law of Nations" and to
"regulate Commerce with foreign Nations." Art. I, §8. To
the President belongs the responsibility of resolving diplo-
matic disputes and commanding the Armed Forces. Art. II,
§§2–3. The Judiciary is assigned no comparable role. See
*Jesner*, 584 U. S., at ___ (opinion of GORSUCH, J.). Respect-
ing all this, the Court has never purported to create a new
cause of action under the guise of the ATS. Now would be
an exceedingly strange time to start.

Admitting this much would make cases like the one be-
fore us easy. The plaintiffs seek a new cause of action.
There may be compelling reasons for adopting one, or per-
haps some diplomatic concern militating against it. But no
one suggests that the plaintiffs' cause of action was among
those the ATS was originally understood to allow. Nor does
anyone suggest that Congress has authorized it. To know
that should be enough to know that any debate over the
plaintiffs' proposed cause of action belongs before lawmak-
ers, not judges.

Making this clear would have other virtues too. It would
get this Court out of the business of having to parse out ever
more convoluted reasons why it declines to exercise its as-
sumed discretion to create new ATS causes of action. It
would absolve future parties from years of expensive and

GORSUCH, J., concurring

protracted litigation destined to yield nothing. It would afford everyone interested in these matters clear guidance about whom they should lobby for new laws. It would avoid the false modesty of adhering to a precedent that seized power we do not possess in favor of the truer modesty of ceding an ill-gotten gain. And it would clarify where accountability lies when a new cause of action is either created or refused: With the people's elected representatives.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 19–416 and 19–453

———————

## NESTLE USA, INC., PETITIONER
19–416    *v.*
JOHN DOE I, ET AL.

## CARGILL, INC., PETITIONER
19–453    *v.*
JOHN DOE I, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 17, 2021]

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER and JUSTICE KAGAN join, concurring in part and concurring in the judgment.

I join Parts I and II of the Court's opinion. Because respondents have failed to allege a domestic application of the Alien Tort Statute (ATS), their complaint must be dismissed. I do not, however, join JUSTICE THOMAS' alternative path to that disposition, which would overrule *Sosa* v. *Alvarez-Machain*, 542 U. S. 692 (2004), in all but name. The First Congress enacted the ATS to ensure that federal courts are available to foreign citizens who suffer international law violations for which other nations may expect the United States to provide a forum for redress. JUSTICE THOMAS would limit the ATS' reach to only the three international law torts that were recognized in 1789. That reading contravenes both this Court's express holding in *Sosa* and the text and history of the ATS.

# I
## A

Included in the Judiciary Act of 1789, the ATS gave federal courts "cognizance . . . of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States." Act of Sept. 24, 1789, §9, 1 Stat. 77. The ATS does not list the torts that fall within its purview. Rather, the statute was "'enacted on the understanding that [federal] common law would provide a cause of action for [a] modest number of international law violations.'" *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, 115 (2013) (quoting *Sosa*, 542 U. S., at 724; some alterations in original). Three such torts were "probably on minds of the men who drafted the ATS": "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.*, at 715 (citing 4 W. Blackstone, Commentaries on the Laws of England 68 (1769)).

Unsurprisingly, the domestic and international legal landscape has changed in the two centuries since Congress enacted the ATS. On the one hand, this Court in *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), "denied the existence of any federal 'general' common law." *Sosa*, 542 U. S., at 726 (quoting 304 U. S., at 78). *Erie* thus foiled the First Congress' expectation "that the common law would," of its own accord, "provide a cause of action for the modest number of international law violations," 542 U. S., at 724, that qualify as "tort[s] . . . in violation of the law of nations," 28 U. S. C. §1350. On the other hand, the class of law-of-nations torts has grown "with the evolving recognition . . . that certain acts constituting crimes against humanity are in violation of basic precepts of international law." *Jesner* v. *Arab Bank, PLC*, 584 U. S. ___, ___ (2018) (slip op., at 9). Like the pirates of the 18th century, today's torturers, slave traders, and perpetrators of genocide are "'*hostis humani generis*, an enemy of all mankind.'" *Sosa*, 542 U. S., at 732.

The Court reconciled these two legal developments in

*Sosa* v. *Alvarez-Machain*. There, the Court explained that it would "be unreasonable to assume that the First Congress would have expected federal courts to lose all capacity to recognize enforceable international norms simply because the common law might lose some metaphysical cachet" in a post-*Erie* world. 542 U. S., at 730. Indeed, while *Erie* rejected the notion of a general federal common law, the "post-*Erie* understanding has identified limited enclaves in which federal courts may derive some substantive law in a common law way." 542 U. S., at 729. For over 200 years (both before and after *Erie*), courts have adhered to the principle that "the domestic law of the United States recognizes the law of nations."[1]  542 U. S., at 729.

While *Sosa* refused to "close the door" to "judicial recognition of actionable international norms," it remains "subject to vigilant doorkeeping." *Ibid.* *Sosa* explained that "courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" contemplated by the First Congress (*i.e.,* norms regarding safe conducts, the rights of ambassadors, and piracy). *Id.,* at 725. The Court elaborated that "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id.,* at 732–733 (footnote omitted).

In the years since, this Court has read *Sosa* to announce a two-step test for recognizing the availability of a cause of action under the ATS. Courts first ask "whether a plaintiff

_____

[1] Other "enclaves" in which federal courts develop legal principles in a common-law fashion include, for example, the areas of admiralty law, disputes between States, and some aspects of federal labor law. See *Collins* v. *Virginia*, 584 U. S. \_\_\_, \_\_\_ (2018) (THOMAS, J., concurring) (slip op., at 7).

can demonstrate that the alleged violation is 'of a norm that is specific, universal, and obligatory.'" *Jesner*, 584 U. S., at ___–___ (plurality opinion) (slip op., at 11–12) (quoting *Sosa*, 542 U. S., at 732). If so, then "it must be determined further whether allowing [a] case to proceed under the ATS is a proper exercise of judicial discretion." *Jesner*, 584 U. S., at ___ (slip op., at 12).

## B

JUSTICE THOMAS reads *Sosa* and this Court's subsequent precedents to impose an "extraordinarily strict" standard at *Sosa*'s second step. *Ante,* at 8. If a court "can identify even one 'sound reaso[n]'" to think Congress might doubt the need for a cause of action under the ATS, we are told, the court should refuse to recognize it. *Ibid.* (quoting *Jesner*, 584 U. S., at ___ (majority opinion) (slip op., at 18); some internal quotation marks omitted).

The trouble with JUSTICE THOMAS' test is that it is unmoored from both history and precedent. The ATS was a statute born of necessity. In the early days of the Republic, the "Continental Congress was hamstrung by its inability" under the Articles of Confederation "to 'cause infractions of treaties, or of the law of nations to be punished.'" *Sosa*, 542 U. S., at 716 (quoting J. Madison, Journal of the Constitutional Convention 60 (E. Scott ed. 1893)). The United States' failure to redress such offenses "caused substantial foreign-relations problems," *Jesner*, 584 U. S., at ___ (slip op., at 7), and "threaten[ed] serious consequences in international affairs," *Sosa*, 542 U. S., at 715. On more than one occasion (and in no uncertain terms), foreign powers expressed their displeasure with the United States' failure to provide redress for law-of-nations violations against their citizens.[2] See *Jesner*, 584 U. S., at ___ (slip op., at 7); see

---

[2] Two "notorious episodes," in particular, underscored Congress' impotence. *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, 120 (2013).

also *Kiobel*, 569 U. S., at 120; *Sosa*, 542 U. S., at 716–717, and n. 11. Congress' "principal objective" in establishing federal jurisdiction over such torts, therefore, "was to avoid foreign entanglements by ensuring the availability of a federal forum where the failure to provide one might cause another nation to hold the United States responsible for an injury to a foreign citizen." *Jesner*, 584 U. S., at \_\_\_–\_\_\_ (slip op., at 8–9).

As this Court explained in *Sosa*, "[t]he anxieties of the preconstitutional period cannot be ignored easily enough to think that the [ATS] was not meant to have a practical effect.'" 542 U. S., at 719. It was Congress' assessment that diplomatic strife is best avoided by providing a federal forum to redress those law-of-nations torts that, if not remedied, could bring international opprobrium upon the United States. Because the First Congress did not pass "the ATS only to leave it lying fallow indefinitely," the statute "is best read as having been enacted on the understanding that the common law would provide a cause of action" for widely recognized torts in violation of the law of nations. *Id.,* at 719, 724; see also *Jesner*, 584 U. S., at \_\_\_ (slip op., at 8) ("[T]he [ATS] was not enacted to sit on a shelf awaiting further

---

The first occurred in 1784 when a French adventurer assaulted the Secretary of the French Legation in Philadelphia, prompting the French Minister to complain to Congress "that a violation of the laws of Nations . . . hath been committed." 27 Journals of the Continental Congress 478 (G. Hunt ed. 1928). Three years later, a New York City constable created another diplomatic imbroglio by entering the home of the Dutch Ambassador and arresting one of his servants. The Ambassador wrote to the Secretary of Foreign Affairs, calling the incident "a most notorious and direct violation of the rights of nations" and demanding the Secretary's "official [interposition] . . . to obtain the satisfaction due . . . by virtue of the laws of nations." Letter from P. Van Berckel to J. Jay (Dec. 18, 1787), in 3 Dept. of State, The Diplomatic Correspondence of the United States of America 443 (1837) (hereinafter Diplomatic Correspondence) (brackets in original).

legislation"). In other words, from the moment the ATS became law, Congress expected federal courts to identify actionable torts under international law and to provide injured plaintiffs with a forum to seek redress.

That historical fact must guide jurists when determining "whether allowing [a] case to proceed under the ATS is a proper exercise of judicial discretion." *Id.*, at ___ (plurality opinion) (slip op., at 12). JUSTICE THOMAS suggests that courts may recognize a cause of action under the ATS only "in very limited circumstances," if at all. *Ante,* at 5. But the ATS calls for much more. The First Congress made the legislative determination that a remedy should be available under the ATS to foreign citizens who suffer "tort[s] . . . in violation of the law of nations." 28 U. S. C. §1350. Barring some extraordinary collateral consequence that could not have been foreseen by Congress, federal courts should not, under the guise of judicial discretion, second-guess that legislative decision.

JUSTICE THOMAS therefore errs in asserting that courts "plac[e] great stress on the separation of powers" when they recognize causes of action under the ATS. *Ante,* at 7. That would be news to the First Congress, which from the beginning counted on federal courts to "recognize enforceable international norms" in order to give the ATS "practical effect." *Sosa,* 542 U. S., at 719, 730. To now suggest that identifying actionable torts "risks 'upset[ting] the careful balance of interests struck by the lawmakers'" is ahistorical at best. *Ante,* at 8 (quoting *Hernández* v. *Mesa,* 589 U. S. ___, ___ (2020) (slip op., at 5); brackets in original).

Indeed, one need look no further than the text of the ATS to understand the task that the First Congress assigned to the Federal Judiciary. As originally enacted, the ATS gave federal courts "cognizance . . . of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States." §9, 1 Stat. 77. Congress did not need to legislate those "causes" into existence because

international law supplied the substantive contours of actionable torts, and domestic law indisputably incorporated international law. See *Sosa*, 542 U. S., at 729. Neither of those premises changed after *Erie*. JUSTICE THOMAS thus misconceives the judicial task in asking whether courts may "create" causes of action under the ATS. *Ante,* at 6; see also *post,* at 4–5 (GORSUCH, J., concurring). The assignment is much more modest: Courts must, based on their interpretation of international law, identify those norms that are so specific, universal, and obligatory that they give rise to a "tort" for which Congress expects federal courts to entertain "causes"—or, in modern parlance, "civil action[s]," 28 U. S. C. §1350—for redress.

Implicitly acknowledging his departure from *Sosa*, JUSTICE THOMAS argues that "precedents since *Sosa* have substantially narrowed the circumstances in which 'judicial discretion'" to recognize ATS causes of action "is permitted." *Ante,* at 11. But the case on which he principally relies, *Hernández* v. *Mesa*, 589 U. S. \_\_\_, is wholly inapposite. *Hernández* cautions that "finding that a damages remedy is implied by a provision that makes no reference to that remedy may upset the careful balance of interests struck by the lawmakers." *Id.,* at \_\_\_ (slip op., at 5). The ATS, however, is not a statute that "makes no reference to [a] remedy." *Ibid.* Just the opposite: The ATS expressly contemplates that federal courts will hear "civil action[s]" for "tort[s] . . . committed in violation of the law of nations." 28 U. S. C. §1350. As such, "a federal court's authority to recognize a damages remedy" under the ATS very much "rest[s] at bottom on a statute enacted by Congress."[3] *Hernández*, 589

––––––––––

[3] For similar reasons, JUSTICE THOMAS' reliance on *Ziglar* v. *Abbasi*, 582 U. S. \_\_\_ (2017), is misplaced. There, this Court explained that, "when deciding whether to recognize an implied cause of action, the 'determinative' question is one of statutory intent." *Id.*, at \_\_\_ (slip op., at 9) (quoting *Alexander* v. *Sandoval*, 532 U. S. 275, 286 (2001)). The ATS

U. S., at ___ (slip op., at 6). Respect for the separation of powers is hardly served by refusing a legislatively assigned task.

## II

Applying the wrong standard at *Sosa*'s second step, JUSTICE THOMAS reaches the wrong answer. He announces that, except for "the three historical torts likely on the mind of the First Congress," "there always is a sound reason" for courts to refuse to recognize actionable torts under the ATS.[4] *Ante,* at 11. He offers three reasons for this dramatic curtailment of the ATS. None is persuasive.

First, JUSTICE THOMAS argues that "creating a cause of action to enforce international law beyond three historical torts invariably gives rise to foreign-policy concerns." *Ante,* at 9. He offers no meaningful support for that sweeping assertion, nor does he explain why an ATS suit for the tort of piracy, for example, would categorically present fewer foreign-policy concerns than a suit for aiding and abetting child slavery. That said, JUSTICE THOMAS is correct insofar as he observes that, in some subset of cases, the diplomatic costs of allowing an ATS suit to proceed may outweigh the benefits of providing redress to an injured foreign citizen. "[W]hen international friction" does arise, however, "a court

_____

leaves no room to doubt that Congress intended foreign citizens to be able to bring "civil action[s]" for "tort[s] . . . committed in violation of the law of nations." 28 U. S. C. §1350.

[4] Notably, JUSTICE THOMAS' alternative disposition would not answer the question this Court granted certiorari to address, *i.e.*, whether domestic corporations are immune from suit under the ATS (regardless of the kind of torts for which they are sued). See Pet. for Cert. in No. 19–416, at i; Pet. for Cert. in No. 19–453, at i. For reasons similar to those articulated in my dissent in *Jesner* v. *Arab Bank*, *PLC*, 584 U. S. ___, ___ (2018), I would answer this question in the negative. (So would four other Justices.) As JUSTICE GORSUCH ably explains, there is no reason to insulate domestic corporations from liability for law-of-nations violations simply because they are legal rather than natural persons. See *post,* at 1–4 (concurring opinion).

should respond with the doctrine that speaks directly to the friction's source." *Jesner*, 584 U. S., at \_\_\_ (SOTOMAYOR, J., dissenting) (slip op., at 22). Such tools include the presumption against extraterritoriality, limits on personal jurisdiction, case-by-case deference to the political branches, and the doctrines of exhaustion, *forum non conveniens*, and international comity. See *ibid.*; *Kiobel*, 569 U. S., at 133 (BREYER, J., concurring in judgment); *Sosa*, 542 U. S., at 733, n. 21. Ignoring all these options, JUSTICE THOMAS would instead bar any ATS suit that seeks to hold a defendant liable for violating any international norm that developed after the 18th century. That is a gross overreaction to a manageable (and largely hypothetical) problem.

Moreover, in arguing that ATS litigation "'inherent[ly]' raises 'foreign-policy concerns,'" *ante,* at 9 (quoting *Jesner*, 584 U. S., at \_\_\_ (majority opinion) (slip op., at 19)), JUSTICE THOMAS ignores the other side of the equation: that foreign nations may take (and, indeed, historically have taken) umbrage at the United States' refusal to provide redress to their citizens for international law torts committed by U. S. nationals within the United States. See *supra,* at 4, and n. 2. Closing the courthouse doors thus "gives rise to foreign-policy concerns" just as "invariably," *ante,* at 9, as leaving them open.

Second, JUSTICE THOMAS suggests that federal courts lack "the 'institutional capacity' to consider all factors relevant" to recognizing actionable torts under the ATS. *Ante,* at 10; see also *post,* at 5–6 (opinion of GORSUCH, J.). It would be surprising (and, I suspect, distressing) to the Congress that enacted the ATS to learn that federal courts lack institutional capacity to do the very thing the ATS presumes they will do. JUSTICE THOMAS' pessimism aside, there is no reason to doubt federal courts' ability to identify those norms of international law that are sufficiently "'specific, universal, and obligatory'" to give rise to a cause of action under the ATS. *Jesner*, 584 U. S., at \_\_\_ (plurality

opinion) (slip op., at 12) (quoting *Sosa*, 542 U. S., at 732). After all, "[f]or two centuries" this Court has "affirmed that the domestic law of the United States recognizes the law of nations." *Id.*, at 729. There is nothing so mysterious about a law's international origins that would prevent courts— bodies specifically tasked with, and particularly capable of, interpreting and applying laws—from ably adjudicating a suit for damages arising out of a "tort . . . committed in violation of the law of nations."[5] 28 U. S. C. §1350.

Finally, pointing to the Trafficking Victims Protection Reauthorization Act (TVPRA), JUSTICE THOMAS argues that Congress' decision to impose criminal and civil liability on human traffickers indicates that "Congress might doubt" the wisdom of recognizing a cause of action for torts other than the violation of safe conducts, infringement of the rights of ambassadors, and piracy. *Ante,* at 9. It is hard to understand why that would be true. That Congress has chosen to legislate against certain abhorrent conduct does not make that conduct any less tortious under international law. Nor does it increase the likelihood that negative "practical consequences" will arise from allowing foreign citizens

---

[5] While international law supplies the substantive prohibitions that give rise to actionable torts under the ATS (*e.g.*, the prohibition against child slavery), domestic law provides the answer to any subsidiary questions regarding "how a particular actor is held liable for a given law-of-nations violation." *Jesner*, 584 U. S., at ___ (SOTOMAYOR, J., dissenting) (slip op., at 2). To the extent JUSTICE THOMAS is worried that federal courts are incapable of identifying such rules of liability in the absence of statutory direction, his concern is belied by the Federal Judiciary's extensive record of doing just that. See, *e.g.*, *Boyle* v. *United Technologies Corp.*, 487 U. S. 500, 512–513 (1988) (recognizing a "Government contractor defense" to state-law product-liability suits); *Consolidated Rail Corporation* v. *Gottshall*, 512 U. S. 532, 541–557 (1994) (recognizing and defining the scope of liability for negligent infliction of emotional distress under the Federal Employers' Liability Act); *Agency Holding Corp.* v. *Malley-Duff & Associates, Inc.*, 483 U. S. 143, 156 (1987) (borrowing the Clayton Act's statute of limitations for purposes of civil actions brought under the Racketeer Influenced and Corrupt Organizations Act).

to hold defendants liable for their torts under the ATS. *Sosa*, 542 U. S., at 732. On the contrary, the fact that Congress authorized victims of slavery to sue perpetrators under the TVPRA provides strong evidence that Congress would not, in fact, doubt the efficacy of permitting victims of slavery to sue perpetrators under the ATS (insofar as the plaintiffs seek a domestic application of the statute).

JUSTICE THOMAS replies that, because the TVPRA is not "a retroactive statute," entertaining respondents' suit would "impermissibly second-guess Congress' decision not to subject past conduct to a new standard." *Ante,* at 10. Surely JUSTICE THOMAS does not mean that the prohibition against child slavery is a "new standard." Nor is it tenable to argue that, at the time respondents were enslaved on Ivorian cocoa farms, international law permitted the aiding and abetting of forced labor.[6] Perhaps JUSTICE THOMAS means to argue that, by adding a cause of action to the TVPRA in 2008, Congress implicitly foreclosed the availability of similar causes of action under the ATS. But the legislative history says otherwise: The Conference Report that accompanied the original TVPRA took pains to emphasize "that nothing in [the TVPRA] will preclude trafficking victims from availing themselves of applicable State, local or other Federal laws in seeking compensatory or other damages and relief in any civil proceeding."[7] H. R. Conf.

———————

[6] See, *e.g.*, *Khulumani* v. *Barclay Nat. Bank Ltd.*, 504 F. 3d 254, 268–277 (CA2 2007) (Katzmann, J., concurring) (surveying aiding-and-abetting liability under international law).

[7] JUSTICE GORSUCH also points out that "[t]he one time Congress deemed a new ATS action worth having, it created that action *itself* in the Torture Victim Protection Act of 1991 [(TVPA)]." *Post,* at 5 (concurring opinion). But JUSTICE GORSUCH fails to mention what the Committee Reports accompanying that statute actually said: that while the TVPA "establish[ed] an unambiguous and modern basis for a cause of action" to sue perpetrators of torture and extrajudicial killing, the ATS "has other important uses and should not be replaced." H. R. Rep. No.

Rep. No. 106–939, p. 93 (2000).  At bottom, then, there is simply no basis to infer from "congressional activity," *ante,* at 8, that Congress has by implication grafted a truncated list of actionable torts onto the ATS that appears nowhere in the statutory text.

\*          \*          \*

The First Congress chose to provide noncitizens a federal forum to seek redress for law-of-nations violations, and it counted on federal courts to facilitate such suits by recognizing causes of action for violations of specific, universal, and obligatory norms of international law.  I would not abdicate the Court's obligation to follow that legislative directive.  Because I find no support for JUSTICE THOMAS' position in the ATS or in this Court's precedents, I do not join that portion of JUSTICE THOMAS' opinion.

--------

102–367, pt. 1, p. 3 (1991); accord, S. Rep. No. 102–249, p. 4 (1991).  The Reports cautioned that "claims based on torture or summary executions do not exhaust the list of actions that may appropriately be covered" by the ATS, which "should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law."  H. R. Rep. No. 102–367, at 4; accord, S. Rep. No. 102–249, at 5.

# SUPREME COURT OF THE UNITED STATES

---

Nos. 19–416 and 19–453

---

NESTLE USA, INC., PETITIONER
19–416          *v.*
JOHN DOE I, ET AL.

CARGILL, INC., PETITIONER
19–453          *v.*
JOHN DOE I, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 17, 2021]

JUSTICE ALITO, dissenting.

The primary question presented in the two certiorari petitions filed in these cases is whether domestic corporations are immune from liability under the Alien Tort Statute (ATS), 28 U. S. C. §1350. I would decide that question, and for the reasons explained in Part I of JUSTICE GORSUCH's opinion, which I join, I would hold that if a particular claim may be brought under the ATS against a natural person who is a United States citizen, a similar claim may be brought against a domestic corporation. See also *ante*, at 8, n. 4 (SOTOMAYOR, J., joined by BREYER and KAGAN, JJ., concurring in part and concurring in judgment). Corporate status does not justify special immunity.

The Court instead disposes of these cases by holding that respondents' complaint seeks extraterritorial application of the ATS, but in my view, we should not decide that question at this juncture. It is tied to the question whether the plaintiffs should be allowed to amend their complaint, and in order to reach the question of extraterritoriality, the Court

must assume the answers to a host of important questions. Specifically, the Court must assume: (1) that, contrary to the arguments set out in Part III of JUSTICE THOMAS's opinion and Part II of JUSTICE GORSUCH's opinion, it is proper for us to recognize new claims that may be asserted under the ATS; (2) that the conduct petitioners are alleged to have aided and abetted provides the basis for such a claim; (3) that there is a "specific, universal, and obligatory" international law norm, *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 732 (2004) (internal quotation marks omitted), that imposes liability for what our legal system terms aiding and abetting; (4) that, if there is such a norm, we should choose to recognize an ATS aiding-and-abetting claim, see *id.*, at 725–728, 732, 733, n. 21; and (5) that respondents' complaint adequately alleges all the elements of such a claim, including the requisite *mens rea.* Compare *Doe I* v. *Nestle USA, Inc.*, 788 F. 3d 946, 948–951 (CA9 2015) (Bea, J., dissenting from denial of reh'g en banc) (aider and abettor must act purposefully); *Aziz* v. *Alcolac, Inc.*, 658 F. 3d 388, 398–401 (CA4 2011) (same); *Presbyterian Church of Sudan* v. *Talisman Energy, Inc.*, 582 F. 3d 244, 257–259 (CA2 2009) (same), with *Doe VIII* v. *Exxon Mobil Corp.*, 654 F. 3d 11, 32–39 (CADC 2011) (aider and abettor need only act knowingly), vacated, 527 Fed. Appx. 7 (CADC 2013); Restatement (Third) of Torts: Liability for Economic Harm §28 (2018) (same); Restatement (Second) of Torts §876 (1977) (same). A decision begins to take on the flavor of an advisory opinion when it is necessary to make so many important assumptions in order to reach the question that is actually resolved.

To be sure, Part III of JUSTICE THOMAS's opinion and Part II of JUSTICE GORSUCH's opinion make strong arguments that federal courts should never recognize new claims under the ATS. But this issue was not raised by petitioners' counsel, and I would not reach it here.

For these reasons, I would reject petitioners' argument on

the question of corporate immunity, vacate the judgment below, and remand these cases for further proceedings in the District Court.